**Denise CHAVEZ, Plaintiff–Appellee,**

**United States of America, Intervenor,**

v.

**ARTE PUBLICO PRESS; Nicolas Kanellos; University of Houston, Defendants–Appellants.**

**No. 93–2881.**

United States Court of Appeals, Fifth Circuit.

April 20, 1998.

As Revised Oct. 1, 1998.

Kenneth E. Kuffner, Kuffner & Associates, Jeffrey Lowell Streets, Houston, TX, David Michael Gunn, Hogan, Dubos & Townsend, Houston, TX, for Plaintiff–Appellee.

Michael Eugene Robinson, Mark Bernard Stern, U.S. Dept. of Justice, Civ. Div., App. Staff, Robert V. Zener, Washington, DC, for Intervenor.

Patrick J. Feeney, Austin, TX, John Russel Feather, Bush, Moseley, Riddle & Jackson, Houston, TX, for Defendants–Appellants.

Charles J. Sanders, New York City, Carey R. Ramos, Paul, Weiss, Rifkind, Wharton & Garrison, Charles S. Sims, Prokaver, Rose, Goetz & Mendelsohn, New York City, for Amicus Curiae Ass'n of American Publishers, Inc., The Authors Guild, Inc., Ass'n of American University Presses, Inc., Nat. Music Publishers Ass'n, Inc., Software Publishers Ass'n, American Society of Journalists and Authors, Inc., American Society of Media Photographers, Inc. and Copyright Clearance Center, Inc.

Peter L. Felcher, Paul, Weiss, Rifkind, Wharton & Garrison, Jon Alan Baumgarten, Proskauer, Rose, Goetz, Mendelsohn, New York City, for Amicus Curiae, Ass'n of American Publishers, Inc., The Authors Guild, Inc., Ass'n of American University Presses, Inc., The Nat. Music Publishers Ass'n, Inc and Software Publishers Assn.

Stephanie A. Gore, Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for Amicus Curiae The Nat. Music Publishers Ass'n, Inc.

Christopher Allan Meyer, Michael R. Klipper, Meyer & Klipper, Washington, DC, for Amicus Curiae, American Society of Composers, Authors and Publishers, Broadcast Music, Inc., Business Software Alliance, Inc., Information Industry Ass'n, Motion Picture Ass'n of America, Inc. and Recording Industry Ass'n of America.

Charles L. Gholz, Oblon, Spivak, McClelland, Maier & Neustadt, Arlington, VA, for American Intellectual Property Law Ass'n, Amicus Curiae.

Martin H. Redish, Northwestern School of Law, Chicago, IL, for International Trademark Ass'n, Amicus Curiae.

Before WISDOM, JONES and EMILIO M. GARZA, Circuit Judges.

## ON REMAND FROM THE SUPREME COURT OF THE UNITED STATES

EDITH H. JONES, Circuit Judge:

This Copyright/Lanham Act case was remanded from the Supreme Court for reconsideration in light of its decision in *Seminole Tribe of Fla. v. Florida,* 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996). The issue is whether Congress properly exercised authority to subject states to suit in federal court for violation of those statutes. *See* 15 U.S.C. § 1122; 17 U.S.C. §§ 501, 511. Plaintiff Chavez asserts that the University of Houston infringed her copyright by continuing to publish her book without her consent

and violated the Lanham Act by naming her, also without her permission, as the selector of plays in another book it published. The University of Houston contends that because it enjoys immunity from unconsented-to suit in federal court under the Eleventh Amendment, the case must be dismissed.[1] This time, we agree with the University.

■ Abrogation of a state's Eleventh Amendment immunity turns on an express statement of intent by Congress and a constitutionally valid exercise of power. *See Seminole*, 116 S.Ct. at 1123. Congress recently amended both the Lanham Act and Copyright Act and explicitly required states to submit to suit in federal court for violation of their provisions;[2] thus, the express statement requirement is fulfilled. The remaining, still troubling question is whether Congress had power to compel states to surrender their Eleventh Amendment immunity for these purposes.

In our previous opinion, we concluded that the Supreme Court's variegated jurisprudence supported the theory that the University of Houston impliedly waived Eleventh Amendment immunity because the University chose to enter into a contract with Chavez and use her name after Congress had imposed statutory waivers in the Copyright and Lanham Acts. The state's price of doing business in those areas included the possibility of suit in federal court. This conclusion derived from our understanding of the *Parden* theory of implied waiver of state sovereign immunity. *See Parden v. Terminal Ry. of Ala. State Docks Dept.*, 377 U.S. 184, 84 S.Ct. 1207, 12 L.Ed.2d 233 (1964).

Chavez and numerous *amici* who filed post-remand briefs contend that the *Parden* implied waiver theory survived *Seminole*, and, alternatively, that the provisions in question validly implement congressional power under section 5 of the Fourteenth Amendment. No party now asserts, in light of *Seminole*, that Congress could statutorily abrogate Eleventh Amendment immunity pursuant to its constitutional powers to regulate commerce or copyrights under Article I, Section 8.[3] Although Chavez's theories are weighty, we find them unpersuasive.

I. The Status of *Parden.*

■ It would be superfluous to recount this panel's previous discussion of pre-*Seminole* cases. Suffice it to summarize that *Parden*, in historical context, seemed to imply that a state impliedly consented to suit in federal court when it undertook non-sovereign activities in areas regulated by the federal government. Seizing on our conclusion, Chavez points out that *Seminole* cites *Parden* as "a case holding the unremarkable, and completely unrelated, proposition that the States may waive their sovereign immunity." *Seminole*, 116 S.Ct. at 1128 (citing *Parden* ). This language, embedded in a critique of the reasoning in the *Union Gas* decision,[4] is interpreted by Chavez as a reaffirmation of *Parden*. *Parden* held that when the State of Alabama undertook to operate a railroad, it did so subject to the Federal Employees Liability Act, which permits suit against interstate railroads in federal court, and thus waived its Eleventh Amendment immunity. Chavez reads the reference in *Seminole* to approve *Parden* for the proposition that when a state conducts business in an area subject to federal regulation, and the federal government has expressly conditioned participation in that business on a waiver of Eleventh Amendment immunity, the state's conduct effectuates such a waiver. This is in fact the interpretation of *Parden* used by this court in our previous opinion to explain Justice White's respective positions in *Parden* and in *Union Gas. See Chavez v. Arte Publi-*

---

1. This court's disposition of the other issues between the parties is unaffected by the Supreme Court's remand.

2. *See* Trademark Remedy Clarification Act, Pub.L. No. 102–542, 106 Stat. 3567 (1992) (codified at 15 U.S.C. §§ 1122, 1125(a)); Copyright Remedy Clarification Act, Pub.L. No. 101–553, 104 Stat. 2749 (1990) (codified at 17 U.S.C. §§ 501(a), 511).

3. The constitutional source of interstate trademark regulation, which includes portions of 15 U.S.C. § 1125(a), is the Commerce Clause. *See* 13B Wright et al., *Federal Practice and Procedure* § 3582, at 314 (1984).

4. *See Pennsylvania v. Union Gas Co.*, 491 U.S. 1, 109 S.Ct. 2273, 105 L.Ed.2d 1 (1989).

*co Press,* 59 F.3d 539, 545–46 (5th Cir.1995) [hereinafter *Chavez I* ].

Whether this interpretation fairly reflects *Seminole,* however, is another matter. *Seminole* cites *Parden* only for the statement that "states may waive their sovereign immunity," which is a matter of hornbook law analytically separate from congressional overruling of state sovereign immunity. *Seminole* quashed the latter proposition when it unequivocally overturned *Union Gas:*

> [B]oth the result in *Union Gas* and the plurality's rationale depart from our established understanding of the Eleventh Amendment and undermine the accepted function of Article III. We feel bound to conclude that *Union Gas* was wrongly decided and that it should be, and now is, overruled.

*Seminole,* 116 S.Ct. at 1128. The Court necessarily disavowed not only the *Union Gas* plurality reasoning (the "plan of the convention" theory of Eleventh Amendment waiver), but also Justice White's fifth vote in favor of the *Union Gas* result. Justice White's *Union Gas* concurrence, we inferred in the previous opinion, had to be based on the *Parden* theory of implied waiver. We cannot understand how the Court could have overruled *Union Gas* only in regard to the 4–vote plurality opinion and not *in toto,* and we do not believe it attempted such a feat.

For other reasons, *Seminole* suggests that the *Parden* implied waiver theory has been rejected. First, *Seminole* expressly incorporates much of the reasoning of Justice Scalia's dissent in *Union Gas,* a dissent agreed upon by the same members of the Court who formed the core of the *Seminole* majority. Justice Scalia's dissent explicitly criticizes and describes the sleight of hand involved in the *Parden* implied waiver theory:

> [T]o acknowledge that the Federal Government can make the waiver of state sovereign immunity a condition to the State's action in a field that Congress has authority to regulate is substantially the same as acknowledging that the Federal Government can eliminate state sovereign immunity in the exercise of its Article I powers—that is, to adopt the very principle

[abrogation of state sovereignty] I have just rejected.

*Union Gas,* 491 U.S. at 44, 109 S.Ct. at 2304 (Scalia, J., concurring in part and dissenting in part). As Scalia explained,

> *all* federal prescriptions are, insofar as their prospective application is concerned, in a sense conditional, and—to the extent that the objects of the prescriptions consciously engage in the activity or hold the status that produces liability—can be redescribed as invitations to "waiver."

*Id.* at 43, 109 S.Ct. at 2303 (emphasis in original). Scalia concludes, "If state sovereign immunity has any reality, it must mean more than this." *Id.* at 44, 109 S.Ct. 2304.

Second, *Seminole* reaches the broad conclusion that:

> Even when the Constitution vests in Congress complete lawmaking authority over a particular area, the Eleventh Amendment prevents Congressional authorization of suits by private parties against unconsenting states. The Eleventh Amendment restricts the judicial power under Article III, and Article I cannot be used to circumvent the constitutional limitations placed upon federal jurisdiction.

*Seminole,* 116 S.Ct. at 1131–32 (footnote omitted). In the footnote accompanying this holding, the Court comments on Justice Stevens's criticism that *Seminole* will prohibit federal jurisdiction over suits to enforce the bankruptcy, copyright, and antitrust laws against the states and that there would consequently be "no remedy" for state violations of those federal statutes. *See id.* at 1131 n. 16. The footnote does not rule out, though it would have been improper to rule on, Justice Stevens's fears. It does, however, observe the novelty of the proposition that any of those statutory schemes abrogated the states' sovereign immunity. It also lists other remedies available to redress state violations of federal law. At the very least, this footnote can give no comfort to those who contend that the *Parden* implied waiver theory permits all suits in federal court against unconsenting states founded on the Copyright or Lanham Acts.

■ A fair reading of *Seminole* inescapably suggests that we must "drop the other shoe,"[5] and declare that Congress cannot condition states' activities that are regulable by federal law upon their "implied consent" to being sued in federal court. The express provisions of the Copyright and Lanham Acts that purport to require the contrary are outside of Congress's power under Article I.

This conclusion does not amount to a presumptuous, premature overruling of Supreme Court precedent, which we are forbidden to do. *See Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 484, 109 S.Ct. 1917, 1921–22, 104 L.Ed.2d 526 (1989) ("If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions."). The Supreme Court's precedents had already expressly overruled several implications of *Parden* even before *Seminole* was decided.[6] We believe *Parden* remains viable precisely to the extent found "unremarkable" in *Seminole*—that a state may waive its Eleventh Amendment immunity from suit.[7]

II. Section 5 of the Fourteenth Amendment.

■ The other argument pursued by Chavez and *amici* is that Congress validly exercised its legislative power pursuant to section 5 of the Fourteenth Amendment, because the state court "deprived" Chavez of her "property" without "due process of law" when it violated the Lanham and Copyright Acts. *Seminole* reaffirmed that Congress can abrogate the states' sovereign immunity when acting pursuant to section 5 of the Fourteenth Amendment. *See Seminole*, 116 S.Ct. at 1128 (citing *Fitzpatrick v. Bitzer*, 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976)). This is because "the Fourteenth Amendment, adopted well after the adoption of the Eleventh Amendment and the ratification of the Constitution, operated to alter the pre-existing balance between state and federal power achieved by Article III and the Eleventh Amendment." *Id.*

■ To examine this argument, we assume for present purposes that Congress expressly relied on the Fourteenth Amendment not only when it enacted the Trademark Remedy Clarification Act, but also the Copyright Remedy Clarification Act.[8] Congress can enact legislation under section 5 of the Fourteenth Amendment which embraces any right guaranteed by the Due Process Clause. *See City of Boerne v. Flores*, 521 U.S. 507, 117 S.Ct. 2157, 2163–64, 138 L.Ed.2d 624 (1997) (citing *United States v. Price*, 383 U.S. 787, 789, 86 S.Ct. 1152, 1154, 16 L.Ed.2d 267 (1966)). Congress's power under section 5, however, is "remedial" and designed to enforce the provisions of the Fourteenth Amendment, not to "decree the substance of the Fourteenth Amendment's

---

**5.** *Union Gas*, 491 U.S. at 43, 109 S.Ct. at 2303.

**6.** *See Chavez I*, 59 F.3d at 542–46.

**7.** The Third Circuit, in a related type of case, found any similar discussion of *Parden* irrelevant to its decision, as it believed the state college loan program charged with false advertising under the Lanham Act represented a "core government function" and not voluntary participation in the marketplace, like Alabama's running a railroad in *Parden*. *See College Savings Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.*, 131 F.3d 353, 364–65 (3d Cir.1997). One could contend that the University of Houston's publishing house is also, under the *College Savings Bank* rationale, intimately related to the core government function of education.

**8.** The U.S.Code Congressional and Administrative News states that the Trademark Remedy Clarification Act was passed in part pursuant to

the Fourteenth Amendment. *See* S.Rep. No. 280, 102d Cong., Sess., at 13–15 (1992). The Copyright Remedy Clarification Act does not expressly rely on section 5 of the Fourteenth Amendment. *See* H.R.Rep. No. 282, 101st Cong., 1st Sess. (1989). It may be too much of a leap to infer Congress's reliance on the Fourteenth Amendment in the copyright amendments when it did not expressly state its intent to legislate on that basis. *See Pennhurst State Sch. and Hosp. v. Halderman*, 451 U.S. 1, 16, 101 S.Ct. 1531, 1539, 67 L.Ed.2d 694 (1981). *But see EEOC v. Wyoming*, 460 U.S. 226, 243 n. 18, 103 S.Ct. 1054, 1064 n. 18, 75 L.Ed.2d 18 (1983). *See generally Timmer v. Michigan Dept. of Commerce*, 104 F.3d 833, 845–46 (Boggs, J., concurring in part and dissenting in part). But the result is the same either way.

restrictions on the States." *Id.* at 2164. To paraphrase *City of Boerne,* legislation which alters the meaning of the Due Process Clause cannot be said to be enforcing the Clause. *See id.*

Viewed in light of *Seminole* and *City of Boerne,* Chavez's syllogisms are too facile. Her position is that the copyright contract and her interest in not having her name misappropriated are "property" under the Fourteenth Amendment; the state's breach of contract and misappropriation of her name "deprived her" of property; and since the deprivations were uncompensated, they occurred without due process of law. Finally, because the state "violated" the Due Process Clause, Congress was authorized to abrogate its Eleventh Amendment immunity under section 5 of the Fourteenth Amendment.

▪ Even the first step of Chavez's argument, her claim of property interests protected by the Fourteenth Amendment, is uncertain. While Chavez's statutorily-created right to protect her name from misappropriation is assured by the Lanham Act,[9] this intangible right is not a "property right" protected against the states by the Fourteenth Amendment. In *Paul v. Davis,* 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976), the Supreme Court essentially so held when it concluded that violations of reputational interests by the state are not cognizable under the Due Process Clause. *See id.* at 711, 96 S.Ct. 1155, 1165 ("[B]ut the interest in reputation alone which respondent seeks to vindicate in this action in federal court is quite different from the 'liberty' or 'property' recognized in those [other Supreme Court] decisions.")

In a similar vein, the Third Circuit recently held that a Lanham Act claim for a business's misrepresentation of its own goods and services does not rise to the level of a constitutional tort under the Due Process Clause. Consequently, the court held that Congress did not have power under *Seminole*

to subject the states to suit in federal court for violation of that prong of the Lanham Act. *See College Savings Bank,* 131 F.3d at 358–62.[10]

Chavez's breach of copyright action against the University of Houston raises "property" problems on several levels. Copyrights are indeed a species of property, but the extent to which they are protectable against the states raises troubling issues. In *Seminole,* the Supreme Court noted the absence of caselaw authority over the past 200 years dealing with enforcement of copyrights in federal courts against the states.[11] Surely this dearth implies that there has been no claim against states in the federal courts. Nevertheless, one court of appeals has held that an interest in a copyright is protected by the Due Process and Just Compensation Clauses of the Constitution. *See Roth v. Pritikin,* 710 F.2d 934, 939 (2d Cir.1983). *Roth,* however, did not consider the situation before us, an infringement claim against a state. In *Roth,* the Second Circuit was speculating on the entirely different issue of Congress's inability to retroactively invalidate by statute certain pre-existing copyright contracts between private parties. Only slightly more appropos of this discussion, the Supreme Court affirms that trade secrets are property protected by the Fifth Amendment takings clause. *See Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 1002–03, 104 S.Ct. 2862, 2872–73, 81 L.Ed.2d 815 (1984). By analogy, copyrights constitute intangible property that, for some purposes at least, receives constitutional protection.

The problem at hand can be further refined by noting that in many cases an owner's copyright will be licensed by means of a contract with the state. Breach of the contract might give rise to remedies in contract as well as infringement, perhaps even affording a choice of remedy to the copyright own-

---

**9.** *See Waits v. Frito–Lay, Inc.,* 978 F.2d 1093 (9th Cir.1992); *Better Business Bureau of Metro. Houston, Inc. v. Medical Directors, Inc.,* 681 F.2d 397 (5th Cir.1982).

**10.** *College Savings Bank* carefully limited its holding to the facts before it, and did not express

an opinion on the status under *Seminole* of claims for trademark infringement or misrepresentation of a competitor's goods and services. *Id.* at 362, 116 S.Ct. 1114.

**11.** *See Seminole,* 116 S.Ct. at 1131 n. 16.

er.[12] Although Chavez, for instance, chose to sue for infringement against the University of Houston, her petition suggests that alternative contract claims may have existed.

Where the claim asserted is breach of a contract concerning a copyright, certain consequences follow. First, such claims have been held not to "arise under" the nation's copyright laws for purposes of federal jurisdiction. *See* 28 U.S.C. § 1338; 13B Wright et al., *supra*, § 3872; 3 Nimmer & Nimmer, *supra*, § 12.01[A][1][a]. The ground for such decisions is that a contract case concerning a copyright (or patent) license does not involve construction or adjudication of federal laws and should be left to resolution under state contract law.

Second, even if the interpretation of a contract concerning a copyright arises under federal law, courts have generally held that a state's breach of a contract does not constitute a procedural due process violation cognizable by a § 1983 action in federal court.[13] Courts have been reluctant to federalize ordinary breach of contract suits against the states. *See S & D Maintenance Co. v. Goldin*, 844 F.2d 962, 966–67 (2d Cir.1988). Our research discloses no ordinary breach of contract case that has been allowed to proceed in federal court against a state. There is no obvious reason why contracts concerning copyrights should be treated differently for these purposes, particularly considering the federalism concerns expressed by the "arising under" line of copyright jurisdiction cases.

Thus, all signs point to the existence of a remedy against the states for breach of contracts involving copyrights in state court. The logic of *City of Boerne*, which counsels against reading statutory language to expand the substantive protections of the Bill of Rights, also militates against Chavez's reading of the Trademark Remedy and Copyright Remedy Clarification Acts. Those provisions would be expanding, rather than merely remedying, violations of procedural due process

if they abrogate states' Eleventh Amendment immunity against copyright contract suits.

A separate problem besets the contention that a copyright infringement claim is property protected by the Due Process Clause; the claim proves too much. If it rests on the uniqueness of the property interest created by federal law, which is the source of Chavez's copyright, then it is a direct end-run around *Seminole*'s holding that Article I powers may not be employed to avoid the Eleventh Amendment's limit on the federal judicial power. Congress could easily legislate "property" interests and then attempt to subject states to suit in federal court for the violation of such interests. This end-run is just as possible under a liberal interpretation of the Due Process Clause of the Fourteenth Amendment as it was under theories of Article I rejected by the court in *Seminole*. As the Third Circuit stated in a related context:

> If a state's conduct impacting on a business always implicated the Fourteenth Amendment, Congress would have almost unrestricted power to subject states to suit through the exercise of its abrogation power. Congress could pass any law that tangentially affected the ability of businesses to operate and then create causes of action against the states in federal court if they infringed on those federally created rights. This result would be unacceptable and would conflict directly with the strict limits on Congress's powers to abrogate a state's Eleventh Amendment immunity.

*College Savings Bank*, 131 F.3d at 361. Chavez and her *amici* have offered no distinction, and we perceive none, between her copyright infringement claim and any other tangible or intangible interests that could give rise to Eleventh Amendment abrogation provisions in this way.

Chavez also asserts that the University's actions deprived her of property without substantive due process. In modern judicial history, substantive due process has had

**12.** *See* 3 M. Nimmer & D. Nimmer, *Nimmer on Copyright* § 10.15[A] (1997).

**13.** *See Reich v. Beharry*, 883 F.2d 239, 242 (3d Cir.1989) (collecting cases); *Yatvin v. Madison Metro. Sch. Dist.*, 840 F.2d 412, 416 (7th Cir.

1988); *Jett v. Dallas Ind. Sch. Dist.*, 798 F.2d 748, 754 n..3 (5th Cir.1986), *aff'd in part*, 491 U.S. 701, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989); *Casey v. Depetrillo*, 697 F.2d 22 (1st Cir.1983) (panel including Breyer, J.).

nothing to do with property rights claims, and we are not about to extend this judicially-created doctrine simply to assure private parties of a remedy against unconsenting states in federal court. Perhaps this contention is a careless afterthought of the appellant and *amici.*

The conclusion that section 5 of the Fourteenth Amendment does not embrace congressional enforcement of the copyright and Lanham acts is consistent with the trend of post-*Seminole* decisions. Thus far, only federal statutes that enforce the Equal Protection Clause have been held to permit suits against unconsenting states. *See, e.g., Crawford v. Davis,* 109 F.3d 1281 (8th Cir.1997) (Title IX); *Timmer v. Michigan Dept. of Commerce,* 104 F.3d 833 (6th Cir.1997) (Equal Pay Act). Statutes that enforce the Commerce and Bankruptcy Clauses, on the other hand, have not been found to represent exercises of Congress's Fourteenth Amendment remedial power. *See In re Creative Goldsmiths of Washington, D.C., Inc.,* 119 F.3d 1140 (4th Cir.1997) (holding that bankruptcy jurisdiction is not within section 5 of the Fourteenth Amendment); *Mills v. Maine,* 118 F.3d 37 (1st Cir.1997) (FLSA); *Aaron v. Kansas,* 115 F.3d 813 (10th Cir. 1997) (FLSA); *Wilson–Jones v. Caviness,* 99 F.3d 203 (6th Cir.1996) (holding that the FLSA is not within the purview of section 5 of the Fourteenth Amendment). *But see College Savings Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.,* 948 F.Supp. 400 (D.N.J.1996) (holding that a patent is "property" for purposes of the Fourteenth Amendment and that "remedial" legislation abrogating state sovereign immunity under *Seminole* is constitutional), *aff'd on other grounds,* 131 F.3d 353 (1997); *Genentech, Inc. v. Regents of the Univ. of Cal.,* 939 F.Supp. 639 (S.D.Ind.1996) (stating, in dicta, that the University could be held liable for patent infringement in federal court pursuant to section 5 of the Fourteenth Amendment).

*In re Creative Goldsmiths* persuasively explained why section 5 of the Fourteenth Amendment cannot embrace congressionally-required waivers of state sovereign immunity in legislation authorized, as here, by Article I constitutional powers:

Furthermore, reliance on § 5 of the Fourteenth Amendment as a post hoc justification for Congress's attempted abrogation in 11 U.S.C. § 106 would require us to ignore the result in *Seminole.* It is self-evident that the Fourteenth Amendment protects individuals from state deprivations of property without due process of law and thus, at some level of generality, could arguably apply to authorize bankruptcy court adjudications of property rights. *But see City of Boerne,* 521 U.S. at ——————, 117 S.Ct. at 2165–66 ("The Enforcement Clause [of the Fourteenth Amendment] ... did not authorize Congress to pass 'general legislation upon the rights of the citizen, but corrective legislation....' The power to 'legislate generally upon' life, liberty, and property, as opposed to the 'power to provide modes of redress' against offensive state action, was 'repugnant' to the Constitution.") (citations omitted). If the Fourteenth Amendment is held to apply so broadly as to justify Congress' enactment of the Bankruptcy Code as a requirement of due process, then the same argument would justify every federal enforcement scheme as a requirement of due process under the Fourteenth Amendment. Clearly, the Indian gaming regulation at issue in *Seminole* would itself have been subject to this style of constitutionalization, for the statute provided for arbitration enforceable in federal court and governed property rights in the form of future gaming proceeds. Thus, *Seminole* itself is inconsistent with any reading that would extend Congressional power under § 5 of the Fourteenth Amendment to reincorporate express Article I powers.

*In re Creative Goldsmiths,* 119 F.3d at 1146–47.

■■■■ The most potent argument in favor of upholding these statutory waiver provisions is a practical one: Without being able to sue the state in federal court, which has exclusive jurisdiction at least over copyright claims, *see* 28 U.S.C. § 1338, Chavez fears she has no effective remedy to protect her name and literary work. This fear is overblown; only retrospective money damages are

unavailable to Chavez. First, it must be emphasized that the states are subject to federal law when they undertake activities regulated by it; after *Seminole*, the Eleventh Amendment only shields them from being sued in federal court. Second, the immunity conferred by the Eleventh Amendment is not limitless.[14] The *Ex Parte Young* doctrine permits suits for prospective injunctive relief, a valuable remedy against Copyright and Lanham Act violations and a remedy specifically contemplated by the clarification acts.[15] Third, as previously noted, suits on copyright and trademark contracts may be heard in state courts. Fourth, the federal government may sue states in federal court to enforce these laws. Finally, Congress may eliminate the perceived remedial gap by conferring concurrent jurisdiction on state courts to enforce these statutes.[16]

*Seminole* condemns Congress's effort to force unconsenting states into federal court as the price of doing business regulated by the Lanham and Copyright Acts. Consequently, 15 U.S.C. § 1122; 17 U.S.C. §§ 501, 511 are invalid to that extent, and Chavez's claims against the University of Houston, a state entity, must be dismissed. Because other remedies may be available to Chavez, as outlined in this opinion, we decline comment on such remedies, but rather than require dismissal, we REVERSE and REMAND for further proceedings consistent herewith.

WISDOM, Circuit Judge, dissenting:

I respectfully dissent.

I have thought about this case a great deal—rarely with any feeling of satisfaction.

**14.** *See Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, ——, 117 S.Ct. 2028, 2046, 138 L.Ed.2d 438 (1997) (O'Connor, J., concurring in part and concurring in judgment).

**15.** The doctrine of *Ex Parte Young* permits suits against state officials to enforce their compliance with any federally-created right. *See* Charles Alan Wright, *Law of Federal Courts* § 48 (1994).

**16.** *See* 3 Nimmer & Nimmer, *supra*, § 12.01[E][2], at 12–51. The potential loss of consistent adjudication might be lessened by allowing state court jurisdiction only over suits against state entities.

Now, nearly three and one-half years after this case was argued, I find myself where I started. I conclude that a state may be sued in federal court under the copyright and trademark laws.[1] I think now that the panel acted prematurely when we concluded that the *Seminole* case overruled *Parden;* this is not a case in which *Parden* waiver applies. Nevertheless, Congress has authority under section 5 of the Fourteenth Amendment to abrogate state sovereign immunity in copyright and trademark infringement cases.[2]

## I. *PARDEN* WAIVER

The majority concludes that "we must 'drop the other shoe' and declare that Congress cannot condition states' activities that are regulable by federal law upon their 'implied consent' to being sued in federal court".[3] I disagree. Only the Supreme Court has the authority to overrule one of its decisions.[4] Over a period of many years, the Court has limited *Parden,* but *Parden* has not been overruled. The reasons offered by the majority to justify its conclusion that *Parden* has been overruled are unpersuasive. The Supreme Court did not necessarily reject Justice White's vote in *Union Gas* when the Court overruled *Union Gas* in the *Seminole* case. The *Seminole* decision does not support the conclusion that Justice Scalia's dissent in *Union Gas* has been elevated to the law of the land. And, there is a place, although limited, for the *Parden* waiver doctrine after *Seminole.* In the wake of *Seminole*, however, *Parden* does not apply in this case before this Court.

**1.** During the three and one-half years since this case was argued, this court has issued two opinions: *Chavez v. Arte Publico Press*, 59 F.3d 539 (5th Cir.1995) (*Chavez I*); *Chavez v. Arte Publico Press*, 139 F.3d 504 (5th Cir.1998) (*Chavez II*).

**2.** *See College Savings Bank v. Florida Prepaid Postsecondary Education Exp. Bd.*, 148 F.3d 1343 (Fed.Cir.1998).

**3.** *Chavez II*, 139 F.3d at 508.

**4.** *Rodriguez de Quijas v. Shearson/American Express Inc.*, 490 U.S. 477, 484, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989).

## A.

The *Union Gas* majority position was the product of a four-justice plurality opinion (upholding the use by Congress of Article I powers to abrogate state sovereign immunity) plus Justice White's separate opinion (based upon the *Parden* waiver doctrine).[5] The *Seminole* Court expressly overruled *Union Gas.*[6] In *Chavez II*, we wrote: "We cannot understand how the Court could have overruled *Union Gas* only in regard to the 4-vote plurality opinion and not in toto, and we do not believe it attempted such a feat."[7] I am now persuaded that the *Seminole* Court intended this feat.

First, as a matter of pure mathematics, the Supreme Court needed to reject only one vote to overrule *Union Gas*. In the absence of a single vote (from the plurality or Justice White), *Union Gas* would not be a majority position. It was not mathematically necessary for the *Seminole* Court to reject both the plurality opinion and Justice White's separate opinion to overrule *Union Gas*. The Supreme Court wrote, at length, attacking the reasoning of the *Union Gas* plurality, but the Court made no effort to criticize Justice White's reasoning. In fact, the Court partially relied upon Justice White's opinion to conclude that the *Union Gas* majority was entitled to a diminished level of respect under the principle of *stare decisis.*[8] In these circumstances, it is doubtful that the *Seminole* Court intended to reject Justice White's position.

If the *Seminole* Court intended to reject Justice White's separate opinion in *Union*

*Gas* as well as the *Parden* waiver theory upon which it relies, the Court would have done so expressly. The Supreme Court knows the language to use in overruling a decision. The *Seminole* Court expressly overruled *Union Gas* in clear language.[9] In *Welch v. Dept. of Highways & Public Transp.*, when the Court intended to limit the reach of *Parden*, the Court did so expressly.[10] The *Welch* Court wrote: "[T]o the extent that *Parden* ... is inconsistent with the requirement that an abrogation of Eleventh Amendment immunity by Congress must be expressed in unmistakably clear language, it is overruled."[11] In *Seminole*, however, the Court did not expressly reject the *Parden* waiver doctrine. Instead, the Court cited *Parden* for the "unremarkable, and completely unrelated, proposition that States may waive their sovereign immunity".[12] It would have been remarkable, indeed, if the *Seminole* Court had cited *Parden* to confirm that a state may waive its sovereign immunity when the Court intended to reject the manner in which the Court found a waiver in *Parden.*

## B.

The *Seminole* decision does not support the view that the Court adopted Justice Scalia's *Union Gas* dissent in its entirety. Professor Kit Kinports has written on this lack of support:

"[T]he *Seminole Tribe* majority did not even cite or refer to [Justice Scalia's dissent], much less endorse it. In fact, the only reference to the implied waiver doc-

---

5. *See Pennsylvania v. Union Gas Co.*, 491 U.S. 1, 109 S.Ct. 2273, 105 L.Ed.2d 1 (1989).

6. 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252, 273 (1996).

7. *Chavez v. Arte Publico Press*, 139 F.3d 504, 507 (5th Cir.1998).

8. *Seminole*, 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d at 273 The *Seminole* Court wrote:

"Reconsidering the decision in *Union Gas*, we conclude that none of the policies underlying *stare decisis* require our continued adherence to its holding. The decision has, since its issuance, been of questionable precedential value, largely because a majority of the Court

expressly disagreed with the rationale of the plurality."

*Id.* Justice White's vote was essential for the Court to conclude that a majority of the Justices rejected the *Union Gas* plurality opinion.

9. The *Seminole* Court wrote: "We feel bound to conclude that *Union Gas* was wrongly decided and that it should be, and now is, overruled." *Id.*

10. 483 U.S. 468, 107 S.Ct. 2941, 97 L.Ed.2d 389 (1987).

11. *Id.* at ——, 107 S.Ct. 2941, 97 L.Ed.2d at 399.

12. *Seminole*, 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d at 272.

trine in the majority opinion in *Seminole Tribe* suggests that the Court consciously limited its decision to the abrogation context. The *Seminole Tribe* majority criticized the *Union Gas* plurality for 'misreading ... precedent' by relying on *Parden* to support its holding that the Commerce Clause gave Congress the power to abrogate the Eleventh Amendment. The principle that states may waive the Eleventh Amendment (the issue of *Parden*) is 'completely unrelated' to the abrogation doctrine (the issue in *Union Gas* and *Seminole Tribe*), the Court explained in *Seminole Tribe*." [13]

Prof. Kinports also rejects the notion that the Court adopted Justice Scalia's position on the merits. Justice Scalia's dissent states that:

"At bottom, then, to acknowledge that the Federal Government can make the waiver of state sovereign immunity a condition to the State's action in a field that Congress has authority to regulate is substantially the same as acknowledging that the Federal Government can eliminate state sovereign immunity in the exercise of its Article I powers—that is, to adopt the very principle that I have just rejected." [14]

Justice Scalia concludes that the differences between *Parden* waiver and abrogation are "verbal distinctions" [15]. The concern that Justice Scalia expresses is that a broad interpretation of the *Parden* waiver doctrine could lead to an end-run around the position accepted in *Seminole*—that Congress could not use its Article I powers to abrogate the state's immunity.

*Parden* waivers would not necessarily allow an end-run around the *Seminole* decision because *Parden* waivers are very limited. A brief discussion of the refinement of the *Par-*

*den* waiver doctrine helps to show that decision's proper, limited role.

### C.

Although states are immune from suit in federal court under the Eleventh Amendment and *Hans. v. Louisiana*,[16] that immunity is not absolute. A state may waive its immunity and consent to a suit in federal court.[17] Or, in limited circumstances, Congress may abrogate state immunity through legitimate legislative action.[18] Waiver and abrogation are separate theories. The *Seminole* Court recognized this when it cited *Parden* for the unremarkable proposition that a state may waive its immunity. The decision in *Seminole* is based upon the abrogation doctrine. Congress may not unilaterally waive state immunity through the exercise of Congress's Article I powers. *Seminole* does *not* suggest that a state is powerless to waive its immunity through voluntary action.

The *Parden* Court held that a state may waive its immunity through voluntary action. Every justice, including those who agreed with Justice White's dissent, accepted this position. The disagreement in the case was over the level of specificity needed to effect a waiver. The majority concluded that "when a State leaves the sphere that is exclusively its own and enters into activities subject to congressional regulation, it subjects itself to that regulation as fully as if it were a private person or corporation." [19] In dissent, Justice White focused upon the need for a clear statement of Congress's intent to condition a state's participation in an industry upon the state's waiver of its immunity. Justice White wrote:

"[T]he Court has indicated that waiver of sovereign immunity will be found only where stated by 'the most express lan-

13. Kit Kinports, *Implied Waiver After Seminole Tribe*, 82 Minn. L.Rev. 793, 814–5 (1998).

14. *Pennsylvania v. Union Gas*, 491 U.S. 1, 44, 109 S.Ct. 2273, 105 L.Ed.2d 1 (1989) (Scalia, J., dissenting).

15. *Id.*

16. 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890).

17. U.S Const. Amend. 11; *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 99, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984).

18. *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996); *Fitzpatrick v. Bitzer*, 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976).

19. *Parden v. Terminal Ry. of Ala.*, 377 U.S. 184, 196, 84 S.Ct. 1207, 12 L.Ed.2d 233 (1964).

guage, or by such overwhelming implication from the text as would leave no room for any other reasonable construction.' If the automatic consequence of a state operation of a railroad in interstate commerce is to be waiver of sovereign immunity, Congress' failure to bring home to the State the precise nature of its option makes impossible the 'intentional relinquishment or abandonment of a known right or privilege' which must be shown before constitutional rights may be taken to have been waived." [20]

The differences in these views is important. The majority approach is similar to the abrogation approach rejected in *Seminole* in that Congress could waive Eleventh Amendment immunity whenever the State acts outside of its core governmental area. The dissent's position is different, focusing upon the traditional concept of waiver. Unless the state is clearly informed that its actions will result in the loss of immunity, the dissent would not find a knowing and voluntary waiver of state sovereign immunity.

Justice White's view was accepted by the Court in *Atascadero State Hosp. v. Scanlon.* The *Atascadero* Court found that the state had not waived its immunity when it accepted federal funds under the Rehabilitation Act because "[t]he Act likewise falls short of manifesting a clear intent to condition participation in the programs funded under the Act on a State's consent to waive its constitutional immunity." [21] In *Welch v. Dept. of Highways & Public Transp.*, the Court confirmed this point when it wrote: "[T]o the extent that Parden ... is inconsistent with the requirement that an abrogation of Eleventh Amendment immunity by Congress must be expressed in unmistakably clear language, it is overruled." [22]

The Court narrowed *Parden* further, finding that the states do not waive their immunity by engaging in core governmental functions.[23] This limitation is consistent with the requirement of a clear expression of intent to waive a state's immunity. By engaging in core functions, the state has shown no intention, one way or the other, to waive its immunity. The state has merely shown its intent to operate as a state.

Through repeated refinement of the *Parden* waiver doctrine, the Supreme Court has shown that this doctrine is grounded in the concept of waiver, not abrogation. These two concepts are "completely unrelated" [24] although they have been confused because of their parallel development.[25] In *Seminole*, the Court continued to acknowledge that a state may waive its immunity, citing *Parden* for this position. Nothing in *Seminole* prevents a state from voluntarily waiving its immunity by engaging in non-core functions so long as the intent to waive the immunity is clear. "The Court's decision in *Seminole Tribe* breathes new life into the implied waiver doctrine, furnishing a reason to distinguish once again between cases of implied waiver and cases of abrogation." [26]

Prof. Chemerinsky, writing before *Seminole,* summarized *Parden*'s limited role as follows:

"In short, constructive waiver of Eleventh Amendment immunity is virtually nonexistent. If it ever will exist, it will be in situations where Congress indicates a clear intent to make states liable in a federal court if they engage in a particular activity, and then a state voluntarily chooses to engage in that conduct. The congressional desire to make states liable must be in 'unmistakable language in the statute itself' and it must be an area where the

---

**20.** *Id.* at 199–200, 84 S.Ct. 1207 (White, J., dissenting).

**21.** 473 U.S. 234, 105 S.Ct. 3142, 87 L.Ed.2d 171, 183 (1985).

**22.** 483 U.S. 468, 107 S.Ct. 2941, 97 L.Ed.2d 389, 399 (1987).

**23.** *Employees of Dept. of Health and Welfare v. Dept. of Public Health & Welfare,* 411 U.S. 279, 93 S.Ct. 1614, 36 L.Ed.2d 251 (1973).

**24.** *Seminole,* 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d at 272.

**25.** Kit Kinports, *Implied Waiver After Seminole Tribe,* 82 Minn. L.Rev. 793, 809 (1998).

**26.** *Id. See also MCI Telecommunications Corp. v. Illinois Bell Telephone Co.,* 1998 WL 156678, *7 (N.D.Ill.1998).

state realistically could choose not to engage in activity." [27]

After *Seminole*, the *Parden* waiver doctrine should have the same limited role. Only when the state is engaged in non-core functions can it "choose not to engage in activity". This severe limitation on the use of *Parden* provides a partial response to Justice Scalia's criticism that, through the *Parden* doctrine, Congress could waive state sovereign immunity in areas where it could not abrogate that immunity directly. When the Supreme Court issued *Seminole*, then, it did not necessarily overrule *Parden*. There is room for the two decisions to co-exist. [28]

### D.

Publishing for profit is outside of the state's core governmental functions. In the circumstances of the present case, however, Texas did not consent to be sued in federal court through its actions. The language used to waive state sovereign immunity in the copyright and trademark laws is written as an absolute, not as a condition. [29] On their face, these provisions are the type of unilateral abrogation of sovereign immunity using Article I powers that were condemned in *Seminole*. [30] To conclude that these laws provide clear notification to the States as to which activities will result in the loss of sovereign immunity is troubling. [31] The Court has been clear that a waiver will not be found lightly. [32] This is not a narrow waiver like that at issue in *Parden* where Congress provided that any entity operating an interstate railroad would be subject to suit in federal court. [33]

A general attempt at abrogation is not sufficient to condition a state's action in a non-core area on the waiver of immunity. If it were sufficient, this would allow a serious end-run around *Seminole* in circumstances in which Congress did not have the authority to abrogate state immunity under section 5 of the Eleventh Amendment. A clear, narrow condition does not suffer from the same defect. [34] For instance, a condition requiring the waiver of immunity for any state that engages in the operation of an interstate railroad for profit would be sufficiently specific so that a state decision to operate an interstate railroad for profit could be interpreted as a knowing and voluntary waiver of the state's immunity. Although this view severely limits the circumstances under which *Parden* waiver would apply, the waiver doctrine would return to its original position before its entanglement and confusion with the abrogation doctrine recently rejected in *Seminole*. For the most part, this position is the same as that articulated by Prof. Chemerinsky.

The present case is not a case in which the *Parden* waiver doctrine applies. It is necessary, then, to consider section 5 of the Fourteenth Amendment.

---

27. Erwin Chemerinsky, *Federal Jurisdiction* § 7.6 at 410 (1994) (footnotes omitted).

28. *See* Kinports, *supra* note 13, at 815–9.

29. "Any State ... shall not be immune, under the Eleventh Amendment of the Constitution of the United States or under any other doctrine of sovereign immunity, from suit in Federal court ... " 17 U.S.C. § 511(a). "Any State ... shall not be immune, under the eleventh amendment of the Constitution of the United States or under any other doctrine of sovereign immunity, from suit in Federal court ..." 15 U.S.C. § 1122.

30. *See* Jacqueline D. Ewenstein, *Seminole Tribe: Are States Free to Pirate Copyrights with Impunity?*, 22 Colum.-VLA J.L. & Arts 91, 100–1 (1997) (citing Senate Report 101–305, 101st Cong.2d. Sess. (1990) to suggest that Congress relied upon *Union Gas* when it attempted to waive state sovereign immunity in copyright cases).

31. One commentator has concluded that similar provisions in the patent laws were not enacted in reliance upon the *Parden* waiver doctrine. *See* Gerald P. Dobson, *Emerging IP Issues in the Wake of Seminole Tribe*, 490 PLI/Pat 179, 213 (1997).

32. *See Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974).

33. Obviously, *Parden*'s factual discussion is not good law today because the law did not expressly provide for the waiver of state sovereign immunity.

34. Prof. Kinports provides other examples in which *Parden* waiver could be found. *See* Kinports, *supra* note 13 at 815–9.

## II. Section 5 of the FOURTEENTH AMENDMENT

In *Seminole*, the Supreme Court continued to recognize Congress's ability to abrogate state sovereign immunity through legitimate exercises of its power under section 5 of the Fourteenth Amendment.[35] This Court has considered Congress's authority under section 5 in several cases since the *Seminole* decision. For example, we have upheld Congress's attempts to abrogate state immunity in the Equal Pay Act,[36] the Age Discrimination in Employment Act,[37] and the Americans with Disabilities Act.[38] We also rejected Congress's attempt to abrogate state immunity in the bankruptcy laws.[39] The majority in the present case concludes that Congress lacks the authority under section 5 to abrogate state immunity for copyright and trademark infringement cases. I disagree.

Congress created legitimate property interests in copyrights and trademarks through a valid exercise of its Article I powers. Article I grants Congress the authority to create certain property interests that are protected from intrusion by the state.[40] Over the course of many years, and in many different contexts, copyrights and trademarks have been treated as a form of "property".[41] The Supreme Court expressly held that patents are protected property.[42] Copy-

rights and trademarks are entitled to the same protection as patents under the Due Process Clause.

Congress has authority to protect those property rights by enacting legislation under section 5. It is not necessary that Congress thought it was enacting legislation under section 5 "as long as Congress had such authority as an objective matter".[43] To determine whether Congress has enacted valid legislation under section 5, we are bound by the Supreme Court's decision in *City of Boerne*[44] and this Court's decision in *Coolbaugh*.[45] We consider whether Congress is pursuing a legitimate objective in enacting legislation and whether there is proportionality and congruence between the means employed to achieve that objective and the harm to be prevented.[46]

Protecting copyright and trademark holders from infringement by an arm of the state government is a legitimate legislative objective under section 5. Section 5 gives Congress the authority to enforce the substantive provisions of the Fourteenth Amendment through appropriate legislation. Section 5's enforcement power extends to the Due Process Clause of section 1 of the Fourteenth Amendment.[47] Naturally, section 1 protects property interests, including interests in

---

**35.** *Seminole*, 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d at 272–3.

**36.** *Ussery v. State of Louisiana*, 150 F.3d 431 (5th Cir.1998).

**37.** *Scott v. University of Mississippi*, 148 F.3d 493 (5th Cir.1998).

**38.** *Coolbaugh v. State of Louisiana*, 136 F.3d 430 (5th Cir.1998).

**39.** *In the Matter of the Estate of Fernandez*, 123 F.3d 241 (5th Cir.1997).

**40.** *See Arnett v. Kennedy*, 416 U.S. 134, 151–2, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974); *Goldberg v. Kelly*, 397 U.S. 254, 261–3, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970).

**41.** *See* John T. Cross, *Intellectual Property and the Eleventh Amendment After Seminole Tribe*, 47 DePaul L.Rev. 519, 544–8 (1998); Ewenstein, *supra* note 30, at 115–20. The majority's reliance upon *Paul v. Davis*, 424 U.S. 693, 96 S.Ct.

1155, 47 L.Ed.2d 405 (1976), to suggest that trademarks are not protected property is misplaced. *Paul* involved an injury to reputation only. The present case involves much more than an interest in reputation. This case involves an interest created under the Lanham Act.

**42.** *See Hartford–Empire Co. v. United States*, 323 U.S. 386, 415, 65 S.Ct. 373, 89 L.Ed. 322 (1945); *Consolidated Fruit–Jar Co. v. Wright*, 94 U.S. 92, 24 L.Ed. 68 (1876).

**43.** *Ussery*, 150 F.3d 431, (citing *Crawford v. Davis*, 109 F.3d 1281 (8th Cir.1997)).

**44.** *City of Boerne v. Flores*, 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997).

**45.** 136 F.3d 430 (5th Cir.1998).

**46.** *Id.* at 435.

**47.** "The provisions of this 'article,' to which § 5 refers, include the Due Process Clause of the

copyrights and trademarks, from deprivations or infringements by the states.

In *College Savings Bank v. Florida Prepaid Postsecondary Educ. Exp. Bd.*, the Federal Circuit concluded that Congress may exercise its authority under section 5 to abrogate state sovereign immunity in patent infringement cases.[48] The Federal Circuit begins with the familiar premise that the Fourteenth Amendment trumps the Eleventh Amendment because the Fourteenth Amendment was adopted later in time. This premise led to the *Seminole* Court's decision allowing Congress to abrogate sovereign immunity under section 5 of the Fourteenth Amendment. The Federal Circuit wrote:

> "Surely the enforcement power of Congress under section 5 must embrace the full range of behavior that the Supreme Court has held to violate the substantive provisions in section 1 of the Amendment. We therefore reject the proposition that congressional authority under section 5 is restricted to only a certain provision of the Fourteenth Amendment, namely the Equal Protection Clause." [49]

The Fourteenth Amendment allows Congress to provide a federal forum for both equal protection and due process violations. Congress can create a federal cause of action against the state in federal court for patent, copyright, or trademark infringement.[50] To be valid under section 5, however, legislation must meet the test of "congruence and proportionality".[51]

"This proportionality inquiry has two primary facets: the extent of the threatened constitutional violations, and the scope of the steps provided in the legislation to remedy or prevent such violations." [52] The interests that Congress seeks to protect here are important ones. As the facts of this case show, the value of copyrights and trademarks can be diminished significantly by state action. By making state's amenable to suit in federal court for copyright and trademark infringement, Congress is attempting to protect copyright and trademark owners from the dilution of their interests at the hands of the state in the same manner that those interests are protected against private action.

The means chosen by Congress to achieve its objective are modest; it is not the type of "general legislation" rejected by the Court in *City of Boerne*.[53] States are subject to suit in federal court only when they infringe upon the interest of a copyright or trademark holder. If a state is sued for infringement, the remedies available will be the same as that available in an action against a private infringer.

Congress enacted a valid waiver of state sovereign immunity for copyright and trademark infringement cases. It may be that this allows an end-run around *Seminole*, but

Fourteenth Amendment." *City of Boerne*, 521 U.S. at ——, 117 S.Ct. at 2163, 138 L.Ed.2d at 638.

**48.** 148 F.3d 1343 (Fed.Cir.1998).

**49.** *Id* at 1349.

**50.** *Id.* at 1352. "If the reasoning of *Fitzpatrick* is to retain vitality, it must be that protecting a well-established property interest such as a patent is a permissible objective under the Fourteenth Amendment.". *Id.* In *College Savings Bank*, the Court rejected the majority's reasoning in this case. The Court wrote:
> "These cases miss the mark, however, because they ignore the essential fact that, because the Fourteenth Amendment was enacted subsequent to the Eleventh Amendment, unlike Article I, it expressly qualified the principle of sovereign immunity."
*Id.* at 1351.

**51.** *Coolbaugh*, 136 F.3d at 435.

**52.** *Id.*

**53.** *City of Boerne*, 521 U.S. at ——-——, 117 S.Ct. 2157, 138 L.Ed.2d at 641–2. In *City of Boerne*, Congress attempted to use section 5 both to enact legislation defining the scope of the First Amendment protection for the free exercise of religion and to make that legislation enforceable against the states. The Court found that Congress exceeded its authority. *Id.* at ——, 117 S.Ct. 2157, 138 L.Ed.2d at 649. In the present case, however, Congress used section 5 for enforcement purposes only. Congress used its Article I authority to create property rights in copyrights and trademarks. Congress can combine its authority under Article I and section 5 of the Fourteenth Amendment to achieve a result that would not be possible in the absence of that combination. *See Fitzpatrick v. Bitzer*, 427 U.S. 445, 456, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976) ("We think that Congress may, in determining what is 'appropriate legislation' for the purpose of enforcing the provisions of the Fourteenth Amendment, provide for private suits against States or state officials which are constitutionally impermissible in other contexts").

this end-run is one grounded in the text of the Constitution and well-established precedent.[54]

I respectfully dissent.

**54.** One may argue that the *Seminole* Court intended its holding to have more bite than this. In response, I ask are you so sure? After the Supreme Court issued its decision In *Bailey v. United States,* 516 U.S. 137, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995), federal public defenders across this nation ran to the courts arguing that a restrictive definition of "use" in a section 924 firearms charge must also limit the definition of "carry". Otherwise, they argued, *Bailey* would have little or no practical effect. The Supreme Court's decision in *Muscarello v. United States,* — U.S. ——, 118 S.Ct. 1911, 141 L.Ed.2d 111 (1998), confirmed that the Court intended for *Bailey* to have this limited effect. My point is this: what looks like a clear statement of broad policy issuing from the Supreme Court may actually be an attempt by the Court to return a level of honesty to the interpretation of statutory or constitutional language.