**David C. JEHNSEN, Plaintiff,**

v.

**NEW YORK STATE MARTIN LUTHER KING, JR., INSTITUTE FOR NONVIOLENCE, Defendant.**

**No. 96–CV–14 (LEK/RWS).**

United States District Court, N.D. New York.

July 7, 1998.

Porter, Wright Law Firm, Columbus, OH, for Plaintiff; Edwin Baranowski, of counsel.

Dennis C. Vacco, Attorney General of the State of N.Y., Albany, NY, for Defendants; David B. Roberts, Asst. Atty. Gen., of Counsel.

### MEMORANDUM–DECISION AND ORDER

KAHN, District Judge.

Presently before the Court are plaintiff's first and second motions for partial summary judgment as well as the defendant's motion to dismiss the complaint. Plaintiff brings this cause of action on two counts. The first claim is to collect damages from an alleged copyright infringement and the second is a pendent state claim to recover past compensation which is allegedly due.

## I. FACTS

Plaintiff David C. Jehnsen ("Jehnsen") worked with the late civil rights leader Dr. Martin Luther King, Jr. ("Dr.King") from 1962 until Dr. King's death in 1968. Jehnsen studied the nonviolent methodology practiced by Dr. King and after Dr. King's death, he continued to develop the methodology and train others in his teachings. Jehnsen served as an instructor and consultant to the Martin Luther King Jr. Center for Non–Violent Social Change in Atlanta, Georgia.

The defendant New York State Martin Luther King, Jr. Institute for Nonviolence (the "Institute") was created by the New York State legislature "in response to the significant public need for the state to develop methods in addition to the current law

enforcement responses to curb violence and encourage the nonviolent management of social conflict." N.Y. Exec. Law § 320 (McKinney 1993). The Institute was in its infancy when it contacted Jehnsen to assist in the establishment, operation and administration of the Institute.

In 1988 and 1989 Jehnsen was employed by the Institute as a "Senior Consultant." For his services, Jehnsen received the rate of $96 per hour not to exceed the sum of $72,-000 for 750 hours of his contract. Jehnsen was also entitled to bill the State up to $25,000 in travel and lodging expenses that he incurred while on Institute business. According to the defendant, the contract was amended in 1989 to adjust the ceiling upward and the Jehnsen ultimately received in excess of $100,000 for his work.

In the Fall of 1989, at the request of the Institute's Executive Director Thomas Cooper ("Cooper"), Jehnsen worked with Dr. Bernard Lafayette ("Lafayette") to co-author "The Leader's Manual, A Structured Guide and Introduction to Kingian Nonviolence: The Philosophy and Methodology" (the "Leader's Manual"). Jehnsen billed the State of New York as a Senior Consultant for the time he spent on the Leader's Manual for work prior to April 1, 1990. Thereafter, Jehnsen received compensation as a salaried contract employee of the Institute for his work on the Leader's Manual.

In January of 1990, Jehnsen and Lafayette presented finalized copies of the Leader's Manual to Cooper. On the cover of the Leader's Manual was a copyright notice specifying that Jehnsen and Lafayette were the copyright owners. Cooper voiced an objection to the copyright notice which excluded the Institute. Cooper also considered the work to be incomplete since he felt that the authors had failed to provide proper credit to Dr. King, Mahatma Ghandi, and Richard and Hepsebagh Hauser for the ideas contained in the Leader's Manual. Jehnsen and Lafayette thereafter attempted to reach an agreement with Cooper where the Institute would share in the ownership of the copyright and the proceeds from the sale of the Leader's Manual would be distributed in the amount of 40% each to Jehnsen and Lafayette and 20% to the Institute. Although a contract was drafted, this agreement was never consummated. However, Jehnsen reproduced 300 copies of the Leader's Manual with the Institute included in the copyright notice relying upon the imminent signing of the agreement.

In January of 1991, Jehnsen sent a Copyright License Agreement to the Institute which set forth more restrictive terms than the aforementioned joint ownership proposal.[1] This agreement was never signed by any of the parties. Thereafter, on June 19, 1991 Jehnsen obtained a Federal Copyright Registration [2] listing Jehnsen and Lafayette as co-owners of the Leader's Manual.

Jehnsen asserts that the Institute generated over two million dollars in training fees while using the Leader's Manual without permission. Furthermore, Jehnsen asserts that the Institute has copied the work in its entirety and has used portions of the Leader's Manual in its own curriculum manual. In all, Jehnsen contends that over 5,000 copies of manuals which contain all or substantial portions of the Leader's Manual have been wrongly distributed by the Institute. The Institute contends that the 300 copies provided by the plaintiff were never sold by the Institute and were only used for training purposes. Due to a lack of funding, the Institute ceased functioning in March of 1996.

## II. DISCUSSION

In plaintiff's first motion for partial summary judgment, Jehnsen asserts that summary judgment is appropriate for the copy-

---

1. Specifically, the Copyright License Agreement set forth that Jehnsen and Lafayette would grant the Institute the right and license to print, publish, sell and distribute the Leader's Manual for the retail price of $25; that each copy would have a cover page identifying Jehnsen and Lafayette as joint authors; that the Institute would pay a royalty on every copy sold or distributed at a rate of 25% of the retail price, and that the Agreement would give the Institute a nondivisible part copyright interest in the Leader's Manual with Jehnsen and Lafayette.

2. Registration No. Txu 475–742.

right infringement claim. Defendant's cross-motion to dismiss the claim is based on the argument that the claim is barred by the Eleventh Amendment. In Jehnsen's second motion for partial summary judgment, plaintiff contends that summary judgment is appropriate for the past compensation claim. Because the defendant's motion to dismiss involves a question of the Court's jurisdiction over the matter, it will be addressed first.

### A. *Law of the Case Doctrine*

As an initial matter, plaintiff argues that due to the fact that the defendant raised an Eleventh Amendment argument before the District Court for the Southern District of Ohio, Eastern Division, and was denied relief, it is barred by the law of the case doctrine from raising the argument again. Defendant asserts that because Eleventh Amendment questions raise issues of the jurisdiction of a district court, it is not subject to the law of the case doctrine.

▮▮▮ "The law of the case doctrine 'posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.'" *Pescatore v. Pan Am. World Airways, Inc.*, 97 F.3d 1, 7–8 (1996) (citing *DiLaura v. Power Auth. of the State of N.Y.*, 982 F.2d 73, 76 (2d Cir.1992) (quoting *In re PCH Assocs.*, 949 F.2d 585, 592 (2d Cir. 1991))). Eleventh Amendment immunity is a jurisdictional bar that can be raised *sua sponte* by the court because it "affects our subject matter jurisdiction." *Atlantic Healthcare Benefits Trust v. Googins*, 2 F.3d 1, 4 (2d Cir.1993) (citing *Esparza v. Valdez*, 862 F.2d 788, 793–94 (10th Cir.1988) (court of appeals may raise Eleventh Amendment jurisdictional bar *sua sponte* ), *cert. denied*, 492 U.S. 905, 109 S.Ct. 3214, 106 L.Ed.2d 565 (1989); *cf. Edelman v. Jordan*, 415 U.S. 651, 678, 94 S.Ct. 1347, 1363, 39 L.Ed.2d 662 (1974) ("[T]he Eleventh Amendment defense sufficiently partakes of the nature of a jurisdictional bar so that it need not be raised in the trial court."); *Shabazz v. Coughlin*, 852 F.2d 697, 699–700 (2d Cir.1988)). "[Q]uestions of subject matter jurisdiction are generally exempt from law of the case principles." *Walsh v. McGee*, 918 F.Supp. 107, 112

(E.D.N.Y.1996) (citing 18 Wright, Miller & Cooper, § 4478 at 799 & n. 32). "It is elementary that a federal court cannot create jurisdiction where none exists." *Id.* (citing 5A Wright & Miller § 1350, at 204–05). Therefore, quite simply, the law of the case doctrine does not apply here.

### B. *Eleventh Amendment Immunity*

Defendants have moved to dismiss the action pursuant to Fed.R.Civ.P. 12(b)(1) which permits a party to make a motion to dismiss for lack of subject matter jurisdiction. The defendant argues that the Institute was created by the State and is an arm of the State. The Institute asserts that it was dependent on the State for its funding and that any judgment obtained against it would be satisfied by the State. The plaintiff does not refute these assertions. Citing the recent Supreme Court case of *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996), the defendant contends that the Eleventh Amendment precludes this Court from hearing this action due to the fact that the State has not waived immunity and that Congress has not abrogated immunity on the part of the State.

Plaintiff counters by asserting that Congress has in fact expressly abrogated state sovereign immunity in copyright actions. In turn, defendant argues that in *Seminole Tribe*, the Court held that Congress can only abrogate state sovereign immunity by utilizing a valid exercise of power to abrogate, such as the Fourteenth Amendment, in passing the relevant law. The Institute contends that this was not the case when Congress passed the copyright legislation.

The Eleventh Amendment provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. Amend. XI. "In addition, the Eleventh Amendment also implicitly protects an unconsenting state from suit by its own citizens." *Close v. New York*, 125 F.3d 31, 36 (2d Cir. Sept.4, 1997)(citing *Edelman*, 415 U.S. at 662–63 ("[w]hile the Amendment by its terms does not bar suits

against a State by its own Citizens, this Court has consistently held that an uncontesting State is immune from suits brought in federal courts by her own citizens as well as by citizens of another State")).

■ "Eleventh Amendment immunity, however, is not absolute." *Id.* When a party seeks recovery only from the state, "there are two ways to divest a state of its Eleventh Amendment immunity and hale the state into federal court: (1) Congress may abrogate a state's sovereign immunity through a statutory enactment and (2) a state may waive its immunity and agree to be sued in federal court." *Id.* (citing *Fitzpatrick v. Bitzer,* 427 U.S. 445, 452–56, 96 S.Ct. 2666, 2669–71, 49 L.Ed.2d 614 (1976) and *Atascadero State Hosp. v. Scanlon,* 473 U.S. 234, 238, 105 S.Ct. 3142, 3145, 87 L.Ed.2d 171 (1985)).

### 1. Abrogation of Sovereign Immunity

■ "Congress may not abrogate a state's sovereign immunity unless it: (1) 'unequivocally expresses its intent to abrogate the immunity'; and (2) acts 'pursuant to a valid exercise of power.'" *Id.* (quoting *Seminole Tribe,* 517 U.S. at 55–56, 116 S.Ct. at 1123). Congress has indeed expressly abrogated state sovereign immunity in copyright actions in 17 U.S.C. § 511 which provides:

(a) In general—Any State, instrumentality of a State, and any officer or employee of a State or instrumentality of a State acting in his or her official capacity, shall not be immune, under the Eleventh Amendment of the Constitution of the United States or under any other doctrine of sovereign immunity, from suit in Federal court by any person, including any governmental or nongovernmental entity, for a violation of any of the exclusive rights of a copyright owner . . . .

However, it still remains to be seen whether the second prong of the test, if Congress acted pursuant to a valid exercise of power, has been met.

■ In *Seminole Tribe,* the Supreme Court noted that the authority to abrogate a states Eleventh Amendment immunity had been grounded in *only* two constitutional provisions: (1) the Fourteenth Amendment,

see e.g., *Fitzpatrick,* 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614; and (2) in the Interstate Commerce Clause *Pennsylvania v. Union Gas Co.,* 491 U.S. 1, 109 S.Ct. 2273, 105 L.Ed.2d 1 (1989). *Close,* 125 F.3d at 37, 1997 WL 540848 at *4. The Supreme Court noted that "[i]n *Fitzpatrick,* we recognized that the Fourteenth Amendment, by expanding federal power at the expense of state autonomy, had fundamentally altered the balance of state and federal power struck by the Constitution." *Seminole Tribe,* 517 U.S. at 59–60, 116 S.Ct. at 1125 (citing *Fitzpatrick,* 427 U.S. at 455). The Court noted "that § 1 of the Fourteenth Amendment contained prohibitions expressly directed at the State and that § 5 of the Amendment expressly provided that 'The Congress shall have the power to enforce, by appropriate legislation, the provisions of this article.'" *Id.* (citing *Fitzpatrick,* 427 U.S. at 453). Ultimately, the Court found that "through the Fourteenth Amendment, federal power extended to protrude upon the province of the Eleventh Amendment and therefore that § 5 of the Fourteenth Amendment allowed Congress to abrogate the immunity from suit guaranteed by that Amendment." *Id.*

However, in *Seminole Tribe,* the Supreme Court specifically rejected the second basis for abrogation by overruling *Union Gas Co.* and the proposition that Congress has the power to abrogate a state's Eleventh Amendment immunity through the Interstate Commerce Clause. *Seminole Tribe,* 517 U.S. at 59–63, 116 S.Ct. at 1125–28. "Never before the decision in *Union Gas* had we suggested that the bounds of Article III could be expanded by Congress operating pursuant to any constitutional provision other than the Fourteenth Amendment." *Id.* at 1128. "We feel bound to conclude that *Union Gas* was wrongly decided and that it should be, and now is, overruled." *Id.*

Thus, the only remaining avenue that is a valid exercise of Congressional power to abrogate state sovereign immunity is the Fourteenth Amendment. The power of Congress to regulate and draft copyright legislation is set forth in Article I of the Constitution which provides that the "Congress shall have the Power . . . to Promote the Progress of

Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries . . . ." U.S. Const. art I, § 8, cl. 8. Thus, due to the fact that the copyright legislation was authorized by Article I and not the Fourteenth Amendment, Congress is without authority to abrogate state sovereign immunity for copyright cases. The Supreme Court was aware of this sort of result when it acknowledged Justice Stevens' point that *Seminole Tribe* would "prohibit federal jurisdiction over suits to enforce the bankruptcy, *copyright,* and antitrust laws against the States." [3] *Seminole Tribe,* 517 U.S. at 73 n. 16, 116 S.Ct. at 1132 n. 16 (emphasis added).

Therefore, the only way that this Court has jurisdiction to hear this action is if the State has waived sovereign immunity.

### 2. Waiver of Sovereign Immunity

Jehnsen asserts that the New York State legislature waived immunity for the Institute when it provided that "[t]he institute may sue and be sued, complain, and defend in any court of competent jurisdiction . . . ." N.Y. Exec. Law § 323(10)(McKinney 1993). The defendant argues, however, that this section does not specifically grant a plaintiff the right to bring an action in federal court and. that this type of clause does not waive sovereign immunity.

 The Supreme Court has found that "a State's constitutional interest in immunity encompasses not merely whether it may be sued, but where it may be sued." *Atascadero State Hosp.,* 473 U.S. at 241 (citing *Pennhurst State School and Hosp. v. Halderman,* 465 U.S. 89, 99, 104 S.Ct. 900, 907, 79 L.Ed.2d 67 (1984)). "The Court will give effect to a State's waiver of Eleventh Amendment immunity 'only where stated by the most express language or by such overwhelming implication from the text as [will] leave no room for any other reasonable construction.'" *Port Authority Trans–Hudson Corp. v. Feeney,* 495 U.S. 299, 305, 110 S.Ct.

1868, 1872, 109 L.Ed.2d 264 (1990) (quoting *Atascadero State Hosp.,* 473 U.S. at 239–40 (quoting in turn *Edelman v. Jordan,* 415 U.S. 651, 673, 94 S.Ct. 1347, 1360–61, 39 L.Ed.2d 662 (1974))). "Thus, in order for a state statute or constitutional provision to constitute a waiver of Eleventh Amendment immunity, it must specify the State's intention to subject itself to suit in federal court." *Atascadero State Hosp.,* 473 U.S. at 241 (citing *Smith v. Reeves,* 178 U.S. 436, 441, 20 S.Ct. 919, 921, 44 L.Ed. 1140 (1900); *Great Northern Life Ins. Co. v. Read,* 322 U.S. 47, 54, 64 S.Ct. 873, 876–77, 88 L.Ed. 1121 (1944)).

 Because N.Y. Exec. Law § 323(10) does not specify that the Institute may sue or be sued in *federal court,* it is evident that there has been no waiver of sovereign immunity. As a result, this Court does not have subject matter jurisdiction to hear this case. Therefore, the defendant's motion pursuant to Fed.R.Civ.P. 12(b)(1) must be granted. As a result, the Court will not reach the remaining motions.

Accordingly, it is

ORDERED that the defendant's cross-motion to dismiss for lack of subject matter jurisdiction is GRANTED and the case is dismissed in its entirety; and it is further,

ORDERED that the plaintiff's first motion for partial summary judgment on the copyright infringement claim is DENIED for lack of subject matter jurisdiction; and it is further,

ORDERED that the plaintiff's second motion for partial summary judgment on the past compensation due claim is DENIED for lack of subject matter jurisdiction; and it is further,

ORDERED that the Clerk serve a copy of this order on all parties by regular mail.

IT IS SO ORDERED.

---

**3.** The Court noted that the concern of Justice Stevens that plaintiffs would be left without remedy for state violations of these federal statutes is exaggerated. 116 S.Ct. at 1132 n. 16. The majority noted that injunctive relief would be available under the doctrine of *Ex Parte Young. Id.* It further noted that although the bankruptcy and copyright laws "have been in force for over a century, there has been no established tradition in the lower courts of allowing enforcement of those federal statutes against the States." *Id.*