Alicia Robles DE ROMERO, Plaintiff

v.

INSTITUTE OF PUERTO RICAN
CULTURE, Defendant.

Civil No. 06–1675(SEC).

United States District Court,
D. Puerto Rico.

Dec. 15, 2006.

Eugenio C. Romero, Eugenio C. Romero Law Office, San Juan, PR, for Plaintiff.

Edgardo Colon–Arraras, Goldman Antonetti & Cordova, San Juan, PR, for Defendant.

## OPINION AND ORDER

CASELLAS, Senior District Judge.

Plaintiff filed this suit seeking damages under the Copyright Act, 17 U.S.C.A. §§ 106(a), 501, and 504, for the destruction by Defendant of the mural "Petroglifos". Defendant seeks to dismiss the complaint, asserting that it is protected by the immunity afforded by the Eleventh Amendment. Currently pending before the Court is that Motion to Dismiss (Docket # 18), which Plaintiff opposed (Docket # 23). For the reasons set forth below, Defendant's Motion will be **GRANTED.**

## Background

We state the facts as set forth in the complaint. Plaintiff was the common law wife of the artist Ralph De Romero, who passed away on May 20, 2000. Effective December 22, 2003, a mural by Mr. De Romero called "Petroglifos" was registered to Plaintiff's name at the U.S. Copyright Office. Petroglifos, a scenic mural, was in exhibition at the Puerto Rican Indian Museum (hereinafter "the Museum")— located in the headquarters of the Institute of Puerto Rican Culture (hereinafter "IPRC" or Defendant)—from approximately 1996 until August 28, 2003. The mural was embedded in a gypsum board overlay separated from a structural interior wall of the museum.

Around January 2001, Plaintiff learned that the Museum would be remodeled and requested that Petroglifos be removed, protected, and/or returned to her. Originally, the IPRC informed Plaintiff that Petroglifos would be integrated into the remodeled facility. Later on, however, the IPRC notified Plaintiff that it would not use Petroglifos in the remodeled Museum and that she would therefore have an opportunity to remove the work from the premises. Plaintiff then attempted to coordinate with the IPRC so as to be able to remove Petroglifos, but to no avail. Her efforts came to a decisive end when, on August 28, 2003, the IPRC informed her

that the mural had been destroyed during the remodeling of the Museum.

The instant complaint is based on these facts. Plaintiff seeks to recuperate $500,000.00 in damages pertaining to the moral rights of the author, the value of the destroyed art work, and her own suffering upon dealing with the aforementioned scenario.

## Standard of Review

Rule 12(b)(1) of the Federal Rules of Civil Procedure allows a party to move the Court to dismiss a complaint for lack of subject matter jurisdiction. A motion under this rule may be used to assert that a complaint is barred by the defendant state's sovereign immunity. *See* 5B Charles Alan Wright & Arthur Miller, *Federal Practice and Procedure,* § 1350 (2004); *Murphy v. U.S.,* 45 F.3d 520 (1st Cir.1995) (analyzing under R. 12(b)(1) the United States' motion to dismiss the complaint as barred by its sovereign immunity); *Smith v. Washington Metropolitan Area Transit Authority,* 290 F.3d 201, 205 (4th Cir.2002) ("an assertion of governmental immunity is properly addressed under the provisions of Rule12(b)(1)") (citations omitted). In ruling on such a motion, the Court may consider materials outside the pleadings in order to aid its determination regarding jurisdiction. *González v. U.S.,* 284 F.3d 281, 288 (1st Cir.2002).

## Applicable Law and Analysis

The one and only issue before the Court is whether the Eleventh Amendment Immunity protects Defendant from this action. Despite the singularity of the main question, the discussion must be bifurcated. Our first task is to ascertain whether the states, and their *alter egos,* enjoy such immunity in actions arising under the Copyright Act. Once that point is settled, our attention must turn to whether the IPRC partakes of the Commonwealth's Eleventh Amendment Immunity.

## I. Abrogation of Eleventh Amendment Immunity

The Eleventh Amendment to the Constitution of the United States provides that:

The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State. U.S.C.A. Const. Amend. XI.

■ Despite the limited scope of the Amendment's text, the U.S. Supreme Court has stated that the Eleventh Amendment must be understood "to stand not so much for what it says, but for the presupposition ... which it confirms". *Seminole Tribe of Florida v. Florida,* 517 U.S. 44, 54, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996) (quoting *Blatchford v. Native Village of Noatak,* 501 U.S. 775, 779, 111 S.Ct. 2578, 115 L.Ed.2d 686 (1991)). "That presupposition [. . .] has two parts: first, that each State is a sovereign entity in our federal system; and second, that '[i]t is inherent in the nature of sovereignty not to be amenable to the suit of an individual without its consent.'" *Id.* (quoting *Hans v. Louisiana,* 134 U.S. 1, 10, 10 S.Ct. 504, 33 L.Ed. 842 (1890)). Stated succinctly, the general rule is that "the Constitution does not provide for federal jurisdiction over suits against nonconsenting States." *Kimel v. Florida Board of Regents,* 528 U.S. 62, 72–73, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000).

■ Despite the Amendment's formidable protection, the state's sovereign immunity may be circumvented under some circumstances. In order to enforce compliance with federal law, the Federal Government can bring suit against a State in federal court. *Seminole Tribe,* 517 U.S. at 71, n. 14, 116 S.Ct. 1114 (citing *United*

*States v.·Texas*, 143 U.S. 621, 644–645, 12 S.Ct. 488, 36 L.Ed. 285 (1892)). In the same vein, an individual may sue a state officer so as to "ensure that the officer's conduct is in compliance with federal law." *Id.* (citing *Ex Parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908)). Additionally, a state may waive its immunity by consenting to suit, or Congress, in the exercise of its power to enforce the Fourteenth Amendment, may authorize such suit. *College Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 119 S.Ct. 2219, 144 L.Ed.2d 605 (1999).

 When a state's claim of sovereign immunity is sought to be disarmed by recourse to a purported abrogation of such immunity, the court, as arbiter of the joust between state and federal powers, must make two determinations prior to allowing Congress to overpower the states' sovereignty. First, the court must ask "whether Congress unequivocally expressed its intent to abrogate that immunity." *Kimel*, 528 U.S. at 73, 120 S.Ct. 631 (citing *Seminole Tribe*, 517 U.S. at 55, 116 S.Ct. 1114). If the answer to that inquiry is in the affirmative, the court must then consider "whether Congress acted pursuant to a valid grant of constitutional authority." *Id.* The first question may be disposed of by way of a "simple but stringent test: 'Congress may abrogate the States' constitutionally secured immunity from suit in federal court only by making its intention unmistakably clear in the language of the statute.'" *Id.* (quoting *Dellmuth v. Muth*, 491 U.S. 223, 228, 109 S.Ct. 2397, 105 L.Ed.2d 181 (1989)). Resolution of the second inquiry requires a more complicated analysis.

 In abrogating the states' sovereign immunity, Congress must act pursuant to a constitutional provision that allows for the subjugation of the Eleventh Amendment. The U.S. Supreme Court has discarded Art. I of the Constitution as a possible source of that power. *See, Id.* at 80, 120 S.Ct. 631 ("Congress' powers under Article I of the Constitution do not include the power to subject States to suit at the hands of private individuals"); *Seminole Tribe*, 517 U.S. at 72–73, 116 S.Ct. 1114 ("The Eleventh Amendment restricts judicial power under Article III, and Article I cannot be used to circumvent the limitations placed upon·federal jurisdiction."). By contrast, § 5 of the Fourteenth Amendment "does grant Congress the authority to abrogate the States' sovereign immunity". *Kimel*, 528 U.S. at 80, 120 S.Ct. 631. But that authority is not unferreted. As the Supreme Court has explained, the power granted Congress by § 5 of the Fourteenth Amendment is one of enforcement, not of creation:

> Congress' power under § 5, however, extends only to enforcing the provisions of the Fourteenth Amendment. [...] The design of the Amendment and the text of § 5 are inconsistent with the suggestion that Congress has the power to decree the substance of the Fourteenth Amendment's restrictions on the states. [...] Congress does not enforce a constitutional right by changing what the right is. It has been given the power to enforce, not the power to determine what constitutes a constitutional violation.[1]

---

[1]. The rationale for that holding may be found at p. 529 of the opinion:

> If Congress could define its own powers by altering the Fourteenth Amendment's meaning, no longer would the Constitution be "superior paramount law, unchangeable by ordinary means." It would be "on a level with ordinary legislative acts, and, like other acts, ... alterable when the legislature shall please to alter it."

*City of Boerne v. Flores,* 521 U.S. 507, 519, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997) (internal citations and quotations marks omitted).

 In order to demarcate the fine line dividing "measures that remedy or prevent unconstitutional actions [from] measures that make a substantive change in the governing law" the Supreme Court has devised a congruence and proportionality test. *Id.* at 519–520, 117 S.Ct. 2157 ("[t]here must be a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end".) What this means is that "there must be congruence between the means used and the ends to be achieved" and "[t]he appropriateness of ... [the] measures must be considered in light of the evil presented." *Id.* at 530, 117 S.Ct. 2157. "Strong measures appropriate to address one harm may be an unwarranted response to another, lesser one." A clearer formulation of what is required of Congress when it invokes § 5 to abrogate the states' sovereign immunity may be found in *Florida Prepaid Postsecondary Educ. Expense Bd. v. College Sav. Bank,* 527 U.S. 627, 639, 119 S.Ct. 2199, 144 L.Ed.2d 575 (1999). In such cases, Congress

"must identify conduct transgressing the Fourteenth Amendment's substantive provisions, and must tailor its legislative scheme to remedying or preventing such conduct." Thus, in reviewing whether a Congressional abrogation of state sovereign immunity conforms to the § 5 authority, a court "must first identify the Fourteenth Amendment 'evil' or 'wrong' that Congress intended to remedy, guided by the principle that the propriety of any § 5 legislation must be adjudged with reference to the historical experience it reflects". *Id.* (internal quotations and citations omitted).

True to that admonition, in ascertaining whether a purported abrogation of the states' sovereign immunity passes muster under this test, the U.S. Supreme Court has routinely looked to the legislative record of the statute at issue in order to determine whether Congress had before it evidence of unconstitutional behavior by the states such that it would justify Congress' remedial or preventive measures. *See, Kimel,* 528 U.S. at 89–91, 120 S.Ct. 631 [2]; *Florida Prepaid,* 527 U.S. at 640–646, 119 S.Ct. 2199 [3]; *City of Boerne,* 521 U.S. at 530–532, 117 S.Ct. 2157.

 The first question before the Court is whether the Copyright Act, 17

---

*City of Boerne,* 521 U.S. at 529, 117 S.Ct. 2157 (quoting *Marbury v. Madison,* 1 Cranch 137, 5 U.S. 137, 2 L.Ed. 60).

**2.** At p. 91 of *Kimel,* the Court stated:

A review of the ADEA's legislative record as a whole, then, reveals that Congress had virtually no reason to believe that state and local governments were unconstitutionally discriminating against their employees on the basis of age. Although that lack of support is not determinative of the § 5 inquiry, Congress' failure to uncover any significant pattern of unconstitutional discrimination here confirms that Congress had no reason to believe that broad prophylactic legislation was necessary in this field. (Internal citations omitted.)

**3.** *See,* p. 646:

The legislative record thus suggests that the Patent Remedy Act does not respond to a history of widespread and persisting deprivation of constitutional rights of the sort Congress has faced in enacting proper prophylactic § 5 legislation. [...] Though the lack of support in the legislative record is not determinative, identifying the targeted constitutional wrong or evil is still a critical part of our § 5 calculus ... Here, the record at best offers scant support for Congress' conclusion that States were depriving patent owners of property without due process of law by pleading sovereign immunity in federal-court patent actions. (Internal citations and quotation marks omitted.)

U.S.C. § 101 *et seq.*, as amended, validly abrogates the states' sovereign immunity. The Copyright Act makes any person who violates another's exclusive rights as copyright owner liable for actual or statutory damages. *See*, 17 U.S.C.A. §§ 501, 504. By virtue of the Copyright Remedy Clarification Act (hereinafter CRCA), PL 101–553 (1990), included among those who risk liability if they engage in the conduct proscribed by the Act are "any State, any instrumentality of a State, and any officer or employee of State or instrumentality of a State acting in his or her official capacity." 17 U.S.C. § 501(a). Indeed, "[a]ny state, and any such instrumentality, officer, or employee, shall be subject to the provisions of this title in the same manner and to the same extent as any nongovernmental entity." *Id.*

The language used by Congress leaves little room for argument as to its intention: Congress explicitly extended liability for copyright infringement to the states and its instrumentalities and officers. Because Congress made its intention to abrogate the states' immunity in copyright suits "unmistakably clear", we turn to the second abrogation inquiry: whether Congress was constitutionally authorized to effect such an abrogation.

Per the discussion above, Congress' authority to abrogate the Eleventh Amendment immunity stems from § 5 of the Fourteenth Amendment. Congress may successfully invoke that authority after identifying conduct by the states that violates the Fourteenth Amendment's substantive provisions and tailoring its remedies to curb that conduct. In applying that standard to the CRCA, we find a host of obstacles. The first problem is evident from the inception of the analysis: the legislative history of the CRCA does not refer to § 5 of the Fourteenth Amendment

as the source of authority for abrogating the states' immunity.

Congress' intent in passing the CRCA was to make clear that states should be held liable for copyright infringement. It was guided in that exercise by its belief that in order to effect the abrogation, it needed only to express such an intention within the statute. *See*, S.Rep. No. 101–305 (1990). Perhaps because at the time it passed the CRCA *Seminole Tribe* and *City of Boerne, supra,* had not yet been decided by the Supreme Court, Congress appeared to be unconcerned with the fact that its power to abrogate the states' immunity was founded on the Fourteenth Amendment, and that in order to be able to use such power, it had to fashion legislation that was proportionate to and congruent with the Fourteenth Amendment evil that it sought to erradicate.

Congress' failure to ground its legislation on the Fourteenth Amendment, in and of itself, presents problems for the abrogation inquiry. The Supreme Court, albeit in a footnote, has stated that when Congress is explicit about invoking its authority under certain constitutional clauses, the court is precluded from considering whether other clauses, not mentioned by Congress, provide a successful launching pad for the attack on the states' sovereign immunity. *See, Florida Prepaid*, 527 U.S. at 642, n. 7, 119 S.Ct. 2199. *See also, Chavez v. Arte Publico Press*, 204 F.3d 601, 604 (5th Cir.2000) (stating that *Florida Prepaid* supports the proposition that a court may not consider whether the abrogation is justified in light of a constitutional ground that Congress did not invoke.) Even ignoring that snag, Congress' intent to abrogate the states' immunity in the CRCA does not prosper.

As Supreme Court precedents dictate we should do, we have turned to the legislative history to ascertain the Fourteenth

Amendment evil that Congress sought to remedy, and whether the legislation it passed is tailored to eliminating such evil. As in *Florida Prepaid*, 527 U.S. 627, 119 S.Ct. 2199 (dealing with a purported abrogation in the context of patent suits), the evil here is state infringement of copyrights and the use of Eleventh Amendment immunity to avoid compensating copyright owners for such infringement. Much like what happened with patents and Congress' intent to abrogate the states' immunity as to suits arising out of the infringement thereof, *see, Florida Prepaid, supra* (holding that the Patent and Plant Variety Protection Remedy Clarification Act did not validly abrogate the states' immunity), the legislative record of the CRCA offers scant evidence of widespread copyright infringement by the states in violation of the Due Process Clause.[4] To be sure, there are accounts of a handful of cases in which states infringed copyrights, and at least in some of those cases the offending states used the Eleventh Amendment to shield themselves from responsibility for their actions. *See,* S.Rep. No. 101–305 (1990). But along with the six or seven concrete examples of such infringement that Congress could muster, the record also reveals that Congress heard testimony to the effect that the legislation was premature and that there were other measures that it could take in order to attend the problem of copyright infringement by states. *See,* H.R.Rep. No. 101–282 (1989). At least some of those were rejected due to considerations that are proper within the Article I calculus: for example, concurrent state jurisdiction over copyright suits was rejected because the Copyright Act sought to create a uniform Federal system. *Id. See, Florida Prepaid*, 527 U.S. at 645, 119 S.Ct. 2199 (stating that the need for uniformity in patent law, while undoubtedly important, is a factor that belongs to the Article I calculus and not to the Eleventh/Fourteenth Amendment analysis); *Chavez*, 204 F.3d at 607 (applying the same reasoning to copyrights). As such, the CRCA's legislative history reveals that Congress had scarcely any evidence of unconstitutional action by the states, that it bypassed alternative remedies that did not entail abrogation of immunity for reasons that are extraneous to the Fourteenth Amendment analysis, and that, with such scant evidence, it passed far ranging legislation that conceivably[5] covers more ground than is necessary to curb the states' unconstitutional conduct.[6]

---

4. Of course, in order for the Due Process clause to come into play, copyrights would have to be considered property for the purposes of the clause. Because the Supreme Court in *Florida Prepaid*, 527 U.S. 627, 119 S.Ct. 2199, held that patents are property protected by the Fourteenth Amendment, and because copyrights and patents share a similar nature, it appears that copyrights are also property protected by the Due Process clause. *Chávez*, 204 F.3d at 605, n. 6. For a more detailed discussion of copyrights as property, *see, Chávez v. Arte Público Press*, 157 F.3d 282, 288 (5th Cir.1998), *reh'g granted and opinion vacated*, 178 F.3d 281 (5th Cir.1998), *new opinion issued on remand*, 204 F.3d 601.

5. We say conceivably because the lack of evidence of the states' unconstitutional conduct does not mean that such conduct does not take place. *But see, Chávez*, 157 F.3d at 288 ("In *Seminole*, the Supreme court noted the absence of caselaw authority over the past 200 years dealing with enforcement of copyrights in federal courts against the states. Surely this dearth implies that there has been no claim against states in federal courts.") Simply put, Congress did not show that it was indeed occurring, and given the constraints on Congress when abrogating the states' immunity, it needed to have a record of such conduct in order to effect the intended abrogation.

6. On the CRCA's legislative history and its parallels to the Patent Remedy Act's legislative history, *see generally, Chávez*, 204 F.3d at 605–607.

In fact, what the legislative history shows is that more than consternation over actual or imminent copyright infringement by states in violation of the Due Process clause, Congress was moved by its conclusion "that it would be anomalous and unjustified for State ... institutions to be exempt from certain remedies, while private institutions are not." *Id.* Although the basic wisdom of that premise is self-evident, under *City of Boerne, supra,* and its progeny, it is not enough to effect a valid abrogation of the states' sovereign immunity. As such, we hold that the CRCA did not abrogate the states' (and its officers' and instrumentalities') Eleventh Amendment immunity. In so doing, we join the other courts that, post-*Seminole Tribe,* have faced this issue. *See, Chavez,* 204 F.3d 601 (analyzing the CRCA and its legislative history in light of the congruence and proportionality test, and concluding that it did not validly abrogate the states' immunity); *Rodríguez v. Texas Com'n on the Arts,* 199 F.3d 279 (5th Cir.2000) (concluding that CRCA did not validly abrogate the states' sovereign immunity); *Salerno v. City Univ. of New York,* 191 F.Supp.2d 352 (S.D.N.Y.2001) (dismissing copyright claims against arms of the state because they are immune from such suits); *Jehnsen v. New York State Martin Luther King, Jr. Institute for Nonviolence,* 13 F.Supp.2d 306, 311 (N.D.N.Y.1998) (stating that because "the copyright legislation was authorized by Article I and not the Fourteenth Amendment, Congress is without authority to ab-

rogate state sovereign immunity for copyright cases"); *Rainey v. Wayne State University,* 26 F.Supp.2d 973, 976 (E.D.Mich.1998) ("There is no question that the Eleventh Amendment bars plaintiff's federal copyright infringement claim and state law claims against WSU for monetary damages, as these claims would require payments from the State's coffers"); *Hairston v. North Carolina Agric. & Technical State Univ.,* 2005 WL 2136923 (M.D.N.C.2005) (unpublished) (CRCA not a valid abrogation of states' immunity).[7] *But see, Florida Prepaid,* 527 U.S. at 658, n. 9, 119 S.Ct. 2199 (Stevens, J., dissenting) (suggesting that the CRCA would be able to withstand the congruence and proportionality test as set forth by the majority).

Accordingly, we turn to the narrower question of whether the IPRC enjoys the benefits of the Commonwealth's sovereign immunity.

## II. The IPRC as an-arm-of-the-state

▆ It is settled law that the protection afforded by the Eleventh Amendment extends not only to the states themselves, but also to their instrumentalities and government officials acting in that capacity. *See, Maysonet–Robles v. Cabrero,* 323 F.3d 43, 48–49 (1st Cir.2003), *Wojcik v. Mass. State Lottery Comm'n,* 300 F.3d 92, 99 (1st Cir.2002). Also shielded by the Eleventh Amendment is the Commonwealth of Puerto Rico, despite its lack of formal statehood.[8] *See,* among others, *Mayso-*

**7.** Prior to the Supreme Court's decision in *Seminole Tribe,* 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252, at least two courts had concluded that the CRCA abrogated the states' sovereign immunity. *See, Lambert v. City of Kenner,* 1993 WL 99188 (E.D.La. 1993); *Unix System Laboratories, Inc. v. Berkeley Software Design, Inc.,* 832 F.Supp. 790, 799 (D.N.J.1993). It bears mentioning that in holding that the CRCA validly abro-

gated the states' immunity, the *Lambert* court explicitly relied on *Pennsylvania v. Union Gas Co.,* 491 U.S. 1, 109 S.Ct. 2273, 105 L.Ed.2d 1 (1989), later overruled by *Seminole Tribe.*

**8.** *See, Examining Board v. Flores de Otero,* 426 U.S. 572, 596, 96 S.Ct. 2264, 49 L.Ed.2d 65 (1976) (recognizing that "Puerto Rico occupies a relationship with the United States that has no parallel" in the latter's history); *Rodrí-*

*net–Robles v. Cabrero*, 323 F.3d at 48 n. 3, *Jusino Mercado v. Commonwealth of Puerto Rico*, 214 F.3d 34, 39 (1st Cir.2000), *Ortiz–Feliciano v. Toledo–Dávila*, 175 F.3d 37, 39 (1st Cir.1999).

■ Whether an entity is an arm-of-the-state and thus protected by the states' Eleventh Amendment immunity is a question of federal law. *Fresenius Medical Care Cardiovascular Res., Inc. v. Puerto Rico and the Caribbean Cardiovascular Ctr. Corp.*, 322 F.3d 56, 61 (1st Cir.2003). Because the Eleventh Amendment seeks to protect the state's interest in its public treasury **and** its " 'dignity' interest as a sovereign in not being haled into federal court [ . . . ] [i]t would be every bit as much an affront to the state's dignity and fiscal interests were a federal court to find erroneously that an entity was an arm of the state, when the state did not structure the entity to share its sovereignty." *Id.* at 63.

■ In order to avoid such offense to the state's dignity, the First Circuit has adopted a two-part test to determine whether a particular entity is an arm-of-the-state. First, the court must determine "whether the state has structured the entity to share its Eleventh Amendment immunity." *Pastrana–Torres v. Corporación De Puerto Rico Para La Difusión Públi-*

*ca*, 460 F.3d 124, 126 (1st Cir.2006) (citing *Fresenius*, 322 F.3d 56). In order to answer that inquiry, the court must ascertain: (1) whether the relevant law, by its own terms, makes the entity an arm of the state, or whether it is structured as a separate entity such that it may sue and be sued and has a budget that is independent from that of the Commonwealth, (2) whether the Commonwealth has explicitly claimed or disclaimed responsibility for the entity's debts, (3) whether the entity's functions may properly be characterized as those of a government, and (4) the degree of control over the entity that the state exercises, as manifested by its intrusion into the process of selection and removal of high ranking officials and board members within the entity and its power to veto the decisions of the relevant decision-makers within the entity. *See, Fresenius*, 322 F.3d at 68–72; *Pastrana–Torres*, 460 F.3d at 126–128.[9] In analyzing the aforementioned factors, the court looks to Puerto Rico law. *See, Pastrana–Torres, supra,* at 126 ("This determination [whether the Commonwealth had structured an entity to share its sovereignty] is a question of federal law but can be answered only after consulting the provisions of Commonwealth law that define [the entity's] character."). If, after considering these fac-

---

*guez v. Popular Democratic Party*, 457 U.S. 1, 8, 102 S.Ct. 2194, 72 L.Ed.2d 628 (1982) ("Puerto Rico, like a state, is an autonomous political entity, 'sovereign over matters not ruled by the Constitution.' ") (quoting *Calero–Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663, 673, 94 S.Ct. 2080, 40 L.Ed.2d 452 (1974)). For a more detailed discussion of the U.S.-Puerto Rico relationship, *see, Córdova & Simonpietri Ins. Agency Inc. v. Chase Manhattan Bank*, 649 F.2d 36 (1st Cir.1981), *U.S. v. Vega Figueroa*, 984 F.Supp. 71 (D.P.R. 1997), and authorities cited therein.

9. Also relevant are the factors delineated in *Metcalf & Eddy v. P.R.A.S.A.*, 991 F.2d 935, 939–40 (1st Cir.1993): (1) whether the agency

has funding to satisfy its own judgments; (2) whether the agency's function is governmental or proprietary; (3) whether the agency is separately incorporated; (4) whether the state exerts control over the agency, and if so, to what extent; (5) whether the agency has the power to sue, be sued, and enter contracts in its name; (6) whether the agency's property is subject to taxation; and (7) whether the state has immunized itself from liability for the agency's acts or omissions.

The *Metcalf & Eddy* inquiry into "arms-of-state" was reaffirmed and refined by the First Circuit in *Fresenius*, 322 F.3d 56, in light of intervening Supreme Court decisions. *See, Fresenius* at 68.

tors, the court cannot conclude that the entity has been structured to share the state's sovereign immunity, the second part of the *Fresenius* test comes into play. *Id.* At that point, the focus is "on the risk that money damages will be paid from the state's treasury if the entity is found liable ... whether the state has obligated itself to pay the entity's debts." *Id.* If "it is clear that the state treasury is not at risk, then the control exercised by the state over the entity does not entitle the entity to Eleventh Amendment immunity." *Fresenius,* 322 F.3d at 65.

Before beginning, as must be, by the beginning (i.e., whether the Commonwealth of Puerto Rico has structured the IPRC to share its sovereign immunity), we note that the parties' briefs on this issue are of limited help. While Defendant's arguments stay close to the shallow end of the pool, as far as discussing the first part of the *Fresenius* test, Plaintiff simply refuses to dive into the issue. Instead, Plaintiff both concludes that Defendant's proffered evidence is insufficient to carry its argument of entitlement of immunity to shore and posits that conducting discovery on this point would entail such high costs that it could sink her case entirely. While Plaintiff's position may be superficially sympathetic, it leads the Court nowhere. Litigation entails costs and burdens and the parties may not simply pick and choose which issues (of those relevant to the asserted causes of action) they wish to expend time and resources in and brief appropriately.

■ After that brief sojourn of the legal issues at hand, we return to *Fresenius* and the first part of its test. As such, we embark on a study of the IPRC's enabling act, 18 P.R. Laws Ann. §§ 1195 *et seq.,* and how it structures the entity. The IPRC is "an official, corporate and autonomous entity". 18 P.R. Laws Ann. § 1195. It may

sue and be sued, acquire and dispose of property, and accept gifts or donations. 18 P.R. Laws Ann. § 1198(b)(1), (4) & (5). The IPRC may also bring and prosecute eminent domain proceedings, on behalf of the Commonwealth and with prior approval of the governor. 18 P.R. Laws Ann. § 1198(b)(4). With regards to budget, the IPRC's enabling law created a general fund for the Institute. 18 P.R. Laws Ann. § 1199. This fund receives all money derived from the IPRC's operations, donations received, and any other funds appropriated or assigned to the IPRC. *Id.* The fund is to be used for the IPRC's expenses, and it may also "be invested in debentures of the Commonwealth of Puerto Rico and its dependencies and public corporations, with the approval of the Secretary of the Treasury." *Id.* The IPRC was charged with establishing an accounting system, with the approval of the Secretary of the Treasury, to manage its operations. *Id.* Moreover, each year the IPRC must submit its budget to the Legislature. In addition to that general fund, a special fund for the theatrical division of the IPRC was also created by virtue of the enabling act. 18 P.R. Laws Ann. § 1199a. This fund is attached to the IPRC, and the IPRC must govern it according to rules and regulations it adopts with prior approval of the Secretary of the Treasury. *Id.* The Legislature, among other sources, allots resources to that fund. *Id.* With regards to the government's responsibility for the IPRC's debts, the enabling act neither claims nor disclaims such responsibility. As for the IPRC's functions, they may be characterized as governmental. The IPRC is charged with "carrying out the public policy regarding the development of the arts, humanities, and culture in Puerto Rico" and its enumerated powers and functions relate to that generously phrased mission statement. 18 P.R. Laws Ann. § 1198. Finally, as for the Common-

wealth's control over the IPRC, the following bear mentioning: (1) the IPRC has a board of directors of nine members, eight of which are appointed by the Governor of Puerto Rico with the advice and consent of the Senate; the ninth member is the Chairman of the Musical Arts Corporation; (2) the Governor selects, among his eight appointees, which shall be the Chairman of the Board; (3) the Board, in turn, selects an Executive Director to the IPRC; (4) there is no specific provision in the enabling act giving the Commonwealth (via the governor or other state official) veto power over the Board's decisions.

Upon consideration of these factors, we cannot state that they clearly show that the IPRC is structured to share the Commonwealth's Eleventh Amendment immunity. While some point towards a structure that is independent of the state and its sovereignty (the proclamation that the IPRC is autonomous, that it may sue and be sued, the lack of veto power of the governor over the Board's decisions), others point in the opposite direction (its governmental functions, its power to prosecute eminent domain proceedings in the name of the Commonwealth and with prior approval from the governor, the fact that the regulations concerning the IPRC's funds must be adopted with the approval of the Secretary of the Treasury, the governor's selection of most of the Board Members). Because an examination of the factors pertinent to the first part of the *Fresenius* test proves inconclusive as to the central inquiry of whether the IPRC is structured to share Puerto Rico's sovereign immunity, we turn to the second part of the test.

Thus, our focus must turn to whether the Commonwealth has obligated itself to assume payment of the IPRC's debts. *See, Fresenius,* 322 F.3d at 72. As stated above, there is no provision in the IPRC's enabling act either claiming or disclaiming responsibility for the entity's debts. And although a fund for the IPRC's use and expenditures was created, it is subject to a fair degree of oversight from the Secretary of the Treasury. As for sources of revenues, an important issue in determining whether the IPRC is capable of paying its own debts, the law identifies several: assignments from the government, receipt of donations, sales of property. It does not provide, however, for sources of revenues that have been found present with regards to other entities denied "arm-of-the-state status". *See, Fresenius,* 322 F.3d at 73 (Cardiovascular Center could issue bonds, not guaranteed by the Commonwealth).

However, since "even without ... an explicit promise, the Commonwealth may have assumed this obligation [to pay for the entity's debts] by binding itself to provide virtually of the funds that [the entity] needs to operate," we turn to the practical reality of the IPRC's funding. *See, Pastrana–Torres,* 460 F.3d at 128. The IPRC has submitted a sworn statement outlining its total budget for 2005–2006 and the source of its funding. *See,* Docket # 19. Per the information in that sworn statement, uncontested by Plaintiff, 96% of the IPRC's funds for the 2005–2006 year came from the Commonwealth. The remaining 4% was provided by federal funds earmarked for specific purposes (almost 2%) and the IPRC's self-generated funds (the other 2%).

Plaintiff relies on the fact that some of the IPRC's funds derive from non-Commonwealth sources in her opposition to the motion to dismiss, claiming that the presence of such outside funds deprives the IPRC of Eleventh Amendment Immunity. However, *Pastrana–Torres,* 460 F.3d at 128, does not require that absolutely all of an entity's funds derive from the Commonwealth in order to conclude that, in prac-

tice, the Commonwealth has obligated itself to pay for that entity's debts. We think that the percentage of the IPRC's budget that the Commonwealth provides is so sizable (96%) so as to "virtually provide" all of the IPRC's funds. As such, we find that the IPRC succeeds in establishing its entitlement to Eleventh Amendment Immunity.

**Conclusion**

Because the IPRC is an arm of the Commonwealth of Puerto Rico, and the Commonwealth is entitled to Eleventh Amendment Immunity in suits arising out of copyright infringement, Plaintiff's complaint against the IPRC for copyright infringement of her late husband's work must be **DISMISSED**.

**SO ORDERED.**